Plaintiff seeks judgment against the defendant bank for $1,850, the amount of a cash deposit he alleges he made therein on August 27, 1938. He avers that the amount in currency was delivered by him to and received by C.M. Womack, the then president of the bank, who, in his official capacity, issued a credit memorandum therefor in plaintiff's name instead of a regular deposit slip; that said deposit was not credited to his checking account as was intended nor to any other account in his name. He further avers that said president promised to have prepared and mailed to him the next day, a deposit slip in the customary form, showing that the amount was duly accredited to plaintiff, but did not do so. Payment of the alleged deposit on demand was refused. This suit was instituted on June 1, 1940.
The American Surety Company of New York was surety on the fidelity bond of Womack as president of the bank and this company was also made defendant. However, as to it, exceptions of misjoinder and no cause and no right of action were sustained. The correctness of these rulings is not here questioned, therefore, the surety has passed from the case.
Defendant excepted to the petition as disclosing neither a right nor a cause of action. It does not appear that these exceptions were passed upon. Answering, defendant expressly denies that plaintiff deposited or tendered for deposit to it or its president, C.M. Womack, at any time, the sum of $1,850 or any part thereof and, therefore, denies that it owes him any amount whatever. Further answering, defendant on information and belief, avers:
That prior to the month of August, 1938, C.M. Womack, personally, W.J. Carpenter, and one John Hugh Henry entered into a contract whereby said parties agreed to drill or cause to be drilled wells for oil, gas and other minerals in Claiborne Parish, Louisiana; that Womack and Carpenter personally and individually under said agreement were to and did either loan, pay or advance money to said Henry for the purpose of paying for materials, labor and other expenses necessary to drilling operations, and did in fact pay the same by having honored all checks therefor drawn by Henry on defendant bank; that on August 27, 1938, said W.J. Carpenter left with the said Womack, personally and individually, the sum of $1,850 to pay checks drawn by said Henry and for a record of which between them, Womack issued and delivered to Carpenter a credit memorandum in which was entered the name of "A. Williams" for the reason that Carpenter wished to keep secret his business relations with said Henry because, if known, the impression might be created that there was a partnership relation between them, etc.; that said $1,850 was actually consumed in paying checks drawn on said bank by Henry in keeping with the original agreement between the parties.
The answer contains an alternative defense, which, in view of the conclusions reached by us on the merits of the case, need not be epitomed.
Plaintiff's demand was rejected and his suit dismissed. Following the overruling of motion for new trial and/or rehearing, he appealed. Answering the appeal, defendant pleads that the exceptions of no cause and no right of action filed below are well founded and should have been sustained. This court is asked to consider and sustain them; in the alternative, affirmance of the judgment is prayed for.
As the exceptions were filed prior to trial of the case and before introduction of testimony, their efficacy or lack of it has to be determined from the allegations contained in the petition. The gravamen of appellee's argument is that since plaintiff admitted on the witness stand that the $1,850 did not belong to him, but was deposited in his name by Carpenter for convenience, he has no right nor standing to assert ownership of the fund nor to demand payment thereof from the bank. Article 15 of the Code of Practice and pertinent authorities supporting the principle therein stated are cited. *Page 66 
They are not applicable here because, in the petition, it is expressly alleged that plaintiff personally made the deposit for the purpose of having the amount passed to his checking account; that this had not been done and that defendant had refused to pay over to him the amount after amicable demand. Testimony contradicting these allegations cannot be considered in determining the merits of the exceptions when the time of their filing is taken into account.
W.J. Carpenter died in August, 1939, which was prior to the filing of this suit. We are deprived of the benefit of his testimony. Had he lived the chances largely are that this suit would not have been filed. Mr. Womack, the president of the bank, is the only living person who possesses first hand knowledge of the facts attending and the reason for the delivery of the $1,850 to him. He testified that, as alleged by defendant, he, Carpenter and Henry entered into an agreement for the drilling of wells for oil, gas, etc.; that he and Carpenter obligated themselves to advance the funds needful to drilling operations and did so; that Henry would draw checks from time to time on defendant bank in favor of materialmen, laborers, etc. and that he (Womack) and Carpenter would advance to the bank funds sufficient to pay the checks as they were presented, but no record in the bank was made to disclose their having done so; that Henry had no account in the bank against which the checks were to be charged; that as a rule when checks were paid from funds advanced by Carpenter they were delivered to him and the same course was followed with respect to Womack. Twenty-Seven (27) of these checks in the aggregate of $6,282.31 were found among Carpenter's papers.
When the $1,850 were delivered by Carpenter to Womack a credit memorandum in the following form was delivered to him, to-wit:
"Credit Date 8-27-1938
Account A. Williams Description
Cash $1,850.00
Approved by: CMW "
The $1,850 were not passed to the regular checking account of A. Williams, the plaintiff, but the amount in currency, according to Womack's testimony, was kept segregated from other currency of the bank and was used exclusively in paying off Henry's checks.
The day following the above mentioned transaction, Womack issued to Henry a credit memorandum for $1,860.70 in the exact form as that given Carpenter. The two credits amount to $3,710.70. He testified that he provided the bank with funds on which this memorandum issued. Five checks of Henry, aggregating this amount exactly, save one, were introduced in evidence. The one not introduced was for $1,006.50. It was explained that this check at the time was in the Federal Court in Monroe, Louisiana, where Mr. Womack had been indicted for violating some Federal law governing the conduct of banks. He testified that the funds represented in the two credit memorandums were used to pay these five checks.
We have to confess our inability to wholly understand the methods employed in the bank to take care of Henry's checks, especially the five aggregating $3,710.70. Why the credit memorandums were issued is not made entirely clear unless the amounts thereof were credited to some account in the names of the persons designated therein. Of the thirty-one (31) checks introduced in evidence, only one (for $67.50) was stamped "paid" by the bank. These transactions were quite irregular. The bank was to some extent used to further Womack's personal interest in a manner which he knew would be criticized by the state banking department if the facts were known to it. It is our belief that ledger sheets in the name of Henry and plaintiff were temporarily set up on which were credited respectively the amounts named in the memorandums and that the five checks were charged to these accounts. No effort was made to establish from the bank's records anything to the contrary.
Attention is called to the fact that the four introduced checks are dated from near two to six weeks prior to August 27, 1938. It was explained that remittance to cover the checks, which had to be promptly done or the checks dishonored, was made by defendant to the banks transmitting them and that the checks were thereafter carried as cash items until Womack and Carpenter produced sufficient cash to absorb them. Such financing is not uncommon in small banks when officials thereof engage in outside hazardous ventures. *Page 67 
The five checks mentioned, it appears, were the last to be drawn by Henry. At that time the drilling ventures, it was known, were unsuccessful. Womack testified that the experience cost him $16,000. It likely cost Mr. Carpenter more. It is not unlikely that at that time, in view of the magnitude of previous financial outlays, cash in amounts of near $2,000 was not easy to raise. This could account for the delay in paying the checks in defendant's hands. In this connection Womack testified:
"Q. Mr. Womack, can you explain why Mr. Carpenter was not delivered these checks, his money paid them like these others? A. He would come in and take up the checks. We were both upset; we had a couple or two dry holes and we didn't want to look at those checks. It was grief to look at them.
"Q. Mr. Womack, can you tell me why you issued a credit memorandum to J.H. Henry? A. So we could audit it up.
"Q. In other words, you receipted yourself for the money? A. Yes, sir.
"Q. That credit memorandum was issued August 28th; what was that used for? A. To take care of those checks.
"Q. Why didn't you issue one to Mr. Carpenter? A. He didn't want his name to show in it any way.
"Q. Henry wouldn't have said anything about it? A. I used that for my records and Mr. Carpenter for his records; that was a matter of his personally. He delivered it that way and we checked it up sometimes."
It is apropos to here mention that Mr. Carpenter was a stock holder in defendant bank and was chairman of its Board of Directors. He was a successful business man and, of course, knew the difference between a regular deposit slip and a credit memorandum such as was handed him by Womack. He lived one year following this transaction. Is it not strange that he made no inquiry concerning the deposit or its status for so long a time if he believed the amount passed to plaintiff's checking account? Business men do not so loosely handle substantial amounts of cash money. It would have been most unusual for Mr. Carpenter to have entirely overlooked this amount of money. He had access to the bank's records and could have informed himself definitely concerning same. His attitude and inaction go far to support Womack's testimony.
Plaintiff testified that Carpenter delivered to him the credit memorandum the evening of its date and that he had possession thereof continuously until delivered to his counsel to sue upon. We are sure he is in error in so testifying. Others saw the memorandum in Carpenter's possession during the time plaintiff says he had it. Carpenter exhibited the memorandum to Mr. Fred Wilhite, one of defendant's directors, and remarked, "I am short $1,850.00". This answer is quite significant. The bank did not fail. No depositor lost any money because of the irregularities committed by Womack, so far as the record reveals. Evidently it was all the while solvent. These facts being true, then how could the $1,850 be lost to Carpenter if it was intended as a deposit to plaintiff's account? Carpenter made no demand upon the bank for payment of the amount, yet he continued as chairman of its Board until his death. In making the remark to Mr. Wilhite, he simply meant that he had lost the $1,850 in the oil drilling venture. Sight of the credit memorandum brought unpleasant and regretful recollections.
We think it immaterial to the issues of the case whether Womack received the money from Carpenter in his individual or official capacity, or whether it was credited to a special account in plaintiff's name. The fund was expended in the manner and for the purpose intended by Carpenter. Williams frankly admits that he had no personal interest in it. The credit memorandum was simply initialed by Womack without any official designation.
As generally happens in cases involving improper banking transactions, the testimony in this case is inconclusive in more than one respect; but, in our opinion, plaintiff has not established by a preponderance of the testimony the verity of his claim; on the contrary, the preponderance is with defendant.
The judgment appealed from is affirmed with costs.
DREW and HAMITER, JJ., concur. *Page 68